# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| CHARLES ALDRIDGE, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 16 C 09477 |
| ) | |
| WEXFORD HEALTH SOURCES, ) | Judge John J. Tharp, Jr. |
| INC., GHALIAH OBAISI, as ) | |
| Independent Administrator of the ) | |
| Estate of SALEH OBAISI, M.D., ) | |
| Deceased, and ) | |
| LATONYA WILLIAMS, ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM OPINION AND ORDER

The plaintiff in this case, Charles Aldridge, is incarcerated at Stateville Correctional Center in Crest Hill, Illinois. He experienced severe pain in his hips for several years and was diagnosed with osteoarthritis, or degenerative joint disease. Mr. Aldridge brings this case under 42 U.S.C. § 1983, alleging deliberate indifference to his medical needs on the part of Physician's Assistant LaTonya Williams and Dr. Saleh Obaisi, and an unconstitutional policy, custom, or practice as to Wexford Health Sources, the vendor under contract to provide medical care for the Illinois Department of Corrections. The defendants have filed a motion for summary judgment.[1] Because the undisputed record shows that the defendants provided an appropriate course of treatment for Mr. Aldridge's osteoarthritis, culminating in hip replacement surgery, the defendants' motion for summary judgment is granted.

---

[1] Dr. Obaisi died in December 2017. ECF No. 44-1. His spouse, Ghaliah Obaisi, was appointed as Independent Executor of Dr. Obaisi's estate and in that capacity was substituted for Dr. Obaisi in this action. ECF No. 48.

## BACKGROUND

Mr. Aldridge, who is now 56 years old, was convicted of murder and sentenced to life without parole in 1994. He has been incarcerated at Stateville since 2009. On November 28, 2012, Mr. Aldridge saw Physician's Assistant Williams and complained of pain in his hips and other joints. Defendants' Statement of Facts ("DSOF") ¶ 17. P.A. Williams did not find any deformities, swelling, or other positive findings in examining Mr. Aldridge's hips. *Id.* ¶ 18. She prescribed Motrin, an analgesic balm, and x-rays of Mr. Aldridge's shoulders and lumbar spine. *Id.* ¶ 19. P.A. Williams referred Mr. Aldridge to Dr. Obaisi, the Medical Director at Stateville, and on January 31, 2013, Dr. Obaisi saw Mr. Aldridge and prescribed Mobic, a non-steroidal anti-inflammatory medication that "helps to alleviate inflammation and pain in a patient's joints." *Id.* ¶ 21.

Mr. Aldridge saw P.A. Williams a few weeks later, on February 26, 2013, after he injured his ankle while playing basketball. *Id.* ¶ 23. Mr. Aldridge saw P.A. Williams again on July 24, 2013, stating that he had pain in both hips that had been getting worse over the last six months. *Id.* ¶ 25. The Mobic that Dr. Obaisi prescribed "had helped him some," he said, but Tylenol and the analgesic balm had not. *Id.* P.A. Williams ordered a series of tests to try to rule out different types of arthritis and determine if Mr. Aldridge had osteoarthritis, including bilateral hip x-rays, and ordered Mobic for three more months. *Id.* The radiologist who examined the x-rays found that they indicated degenerative joint disease, or osteoarthritis of the hips. *Id.* ¶ 26. Mr. Aldridge alleges, and the defendants dispute, that the radiologist included a notation "'? Candidate for hip replacement" on Mr. Aldridge's chart.[2] Plaintiff's Statement of Facts ("PSOF") ¶ 8.

---

[2] The defendants do not dispute that the document includes this notation, but object that it cannot be determined whether the radiologist made the notation because "no radiologist was deposed." *See* Defs.' Resp. PSOF ¶ 8, ECF No. 78. That objection is not well-founded. The document in question is an "X-RAY REPORT" and is signed by an M.D. It is reasonable to infer, at this juncture, that the physician reviewing the report was a radiologist, but in any event, the

P.A. Williams saw Mr. Aldridge for a follow-up appointment three weeks later, on August 14, 2013. DSOF ¶ 27. The Mobic appeared to be helping his pain, and P.A. Williams ordered physical therapy, educated Mr. Aldridge about his medical condition, and ordered a Vitamin D level blood test "to check for any issues with Plaintiff's bones"; that test returned a normal result. *Id.* ¶ 28. At this point, P.A. Williams believed "there was nothing more she could do as a provider" and referred Mr. Aldridge to Dr. Obaisi. *Id.* ¶ 29.

Over the next few months, Mr. Aldridge had several appointments with Dr. Obaisi canceled due to prison lockdowns, and once because Dr. Obaisi was not present on-site. *Id.* ¶¶ 30-33. Mr. Aldridge saw Dr. Obaisi on February 4, 2014. Dr. Obaisi examined his hip and found that Mr. Aldridge had no acute symptoms. *Id.* ¶ 34. Dr. Obaisi ordered new x-rays, continued Mr. Aldridge's pain reliever Mobic, and referred him to an orthopedic specialist at UIC. *Id.* ¶ 35.

On April 9, 2014, Mr. Aldridge was evaluated at UIC. The nurse noted that he "had a steady gait, meaning he was walking without difficulty or falling over." *Id.* ¶ 37. Dr. Gonzalez, an orthopedic surgeon at UIC, examined Mr. Aldridge and found that his hip pain "had an insidious atraumatic onset, meaning there was no inciting event which caused it" and that Mr. Aldridge was in no acute distress, though he reported difficulty sitting for long periods of time, moving, jogging, or running. *Id.* ¶¶ 39-40. Dr. Gonzalez recommended physical therapy and continued use of Mobic, to be escalated to steroid hip injections and then to hip replacement if this conservative course of treatment proved unsuccessful. *Id.* ¶ 40.

---

record reflects that a physician made the notation and the notation was plainly included in Mr. Aldridge's medical records, so whether the notation was made by a radiologist or another physician is not material; in either case, the physician who reviewed the x-ray concluded that Mr. Aldridge might be a candidate for hip replacement surgery. As will be discussed, however, that does not necessarily mean that the defendants were deliberately indifferent to Mr. Aldridge's condition by not immediately scheduling surgery.

3

Dr. Obaisi saw Mr. Aldridge for a medical writ follow-up on April 14, 2014, noted that his objective condition had not changed, and gave him a permit for a double mattress. *Id.* ¶ 41. The next week, Dr. Obaisi conducted collegial review for Mr. Aldridge to return to UIC's orthopedic clinic for a follow-up visit that UIC had recommended, which was approved. *Id.* ¶ 42; Obaisi Dep. 136:6-11, ECF No. 59-3. At a nurse sick call on June 27, 2014, Mr. Aldridge was told that he had an upcoming appointment with an orthopedic surgeon at UIC. DSOF ¶ 43. At this appointment, Mr. Aldridge's "gait was steady, indicating that he was not falling over or limping." *Id.* Mr. Aldridge's next appointment with Dr. Obaisi, in September, was canceled due to a prison lockdown and rescheduled for the following week. *Id.* ¶ 44.

On September 29, 2014, Mr. Aldridge returned to UIC and additional x-rays were taken. *Id.* ¶ 45. At an appointment with P.A. Williams on November 10, 2014 for complaints regarding hearing loss, Mr. Aldridge said that he had not had a follow-up on his x-rays, and P.A. Williams referred him to Dr. Obaisi, whom he saw on November 17. *Id.* ¶¶ 46-47. Dr. Obaisi gave an order for Mr. Aldridge to undergo physical therapy, which he began in January 2015. *Id.* ¶¶ 48-49. While Mr. Aldridge initially reported some improvement in his hips with physical therapy, he still had some pain and ultimately the physical therapy was unsuccessful. *Id.* ¶¶ 49-50.

Dr. Obaisi saw Mr. Aldridge again on March 10, 2015, again with no acute findings. Dr. Obaisi changed Mr. Aldridge's pain medication to Naproxen and planned to send him back to UIC. *Id.* ¶¶ 50-51. In light of the ineffectiveness of physical therapy, though Mr. Aldridge's hip condition had not changed from the prior UIC visit, on May 6, 2015 Dr. Gonzalez ordered that he receive steroid injections in his hips. These injections can relieve pain for six to eight months. *Id.* ¶¶ 51-52. Dr. Gonzalez expressed a preference for trying conservative treatment before hip replacement surgery, which can result in a variety of complications. *Id.* ¶ 53. Dr. Obaisi saw Mr.

Aldridge for a medical writ follow-up on May 11, 2015 and noted that he had received an order for steroid injections at UIC. *Id.* ¶ 54. In May and June 2015, Mr. Aldridge submitted two grievances requesting that he be referred for hip replacement surgery. PSOF ¶¶ 10, 12 ("Relief Requested: THAT I BE SENT TO SPECIALIST TO HAVE HIP REPLACEMENT SURGERY.") Mr. Aldridge based his grievances on what he terms the radiologist's "recommendation" that he receive hip replacement surgery. *Id.* ¶ 10. Both grievances were denied on the grounds that they were appropriately addressed by the facility administration, further noting that ordering treatment or medication must be done by the attending physician. *Id.* ¶¶ 11-12.

Mr. Aldridge returned to UIC on September 2, 2015, to see Dr. Malik, an anesthesiologist and medical director of the pain management service at UIC. DSOF ¶ 56. Mr. Aldridge was ambulating without assistance and told Dr. Malik that the pain medication he was then taking, Indomethacin, was helping to control his hip pain. Dr. Malik diagnosed Mr. Aldridge as having osteoarthritis of the hips and ordered steroid injections; Dr. Obaisi held a collegial review and obtained approval on or about September 15. *Id.* ¶ 57. Mr. Aldridge saw P.A. Williams on September 22, 2015 to obtain a refill of his pain medications and to ask about whether his appointment at the pain clinic had been scheduled.[3] *Id.* ¶ 59. P.A. Williams noted at that appointment that he had already been approved to return to the pain clinic, and Mr. Aldridge had the steroid injections at UIC on October 7, 2015. *Id.* ¶¶ 60-61. Dr. Obaisi saw him for a follow-up on October 19, and the next day obtained approval to send him to an orthopedic surgeon at UIC for further follow-up with respect to the steroid injections. *Id.* ¶¶ 62-63. Dr. Obaisi saw Mr. Aldridge again, after his UIC appointment, on November 25, 2015, and adjusted his pain

---

[3] Mr. Aldridge's pain medications, all non-steroidal anti-inflammatories, were changed a few times throughout the course of his treatment, from Mobic to Naprosyn to Indocin and back to Mobic. *See id.* ¶¶ 35, 50, 55, 60, 64

5

medication.

Dr. Obaisi next saw Mr. Aldridge again on April 19, 2016. Mr. Aldridge's condition had not changed, but he was concerned about when he would return to UIC for additional steroid injections. Mr. Aldridge returned to UIC on April 28, 2016 and reported to Dr. Malik that he had good pain relief from the injections for a few months and wanted to repeat them. *Id.* ¶ 66. Dr. Obaisi saw Mr. Aldridge for a follow-up that same day and noted that he had been referred by the pain clinic to UIC's orthopedic clinic for consideration of right hip joint replacement surgery. Dr. Obaisi also renewed Mr. Aldridge's low bunk and double mattress permits. *Id.* ¶ 67.

Mr. Aldridge saw Dr. Gonzalez again on August 9, 2016, after the steroid injections were no longer providing him any pain relief. *Id.* ¶ 68; Gonzalez Dep. 28:2-10, ECF No. 59-6. Dr. Gonzalez recommended hip replacement at that time. DSOF ¶ 68. There was no change in Mr. Aldridge's hip condition from his prior physical exam, and Dr. Gonzalez testified that Mr. Aldridge "did not require emergent or urgent treatment, but could be treated electively," as the outcome of the surgery would be the same no matter when it occurred, and Mr. Aldridge "would not sustain any immediate or long-term harm by waiting for the surgery." *Id.* ¶¶ 68-69. Dr. Obaisi saw Mr. Aldridge for another follow-up on August 9 after his return from UIC and obtained approval for the hip replacement in collegial review on August 19. *Id.* ¶ 70. Two months later, on October 3, 2016, Mr. Aldridge filed this lawsuit, asserting that the defendants' "blatant inappropriate treatment and woefully inadequate actions and conscious inactions caused Plaintiff injuries, prolonged pain, exacerbated his medical condition and caused his knees, back, left hip to become more painful . . . ." Compl., ECF No. 1 at ¶ 6.

On March 7, 2017, Mr. Aldridge returned to UIC to see Dr. Gonzalez, who noted that Mr. Aldridge's surgery was scheduled for September 7 and that he would need to return for a pre-

operative appointment. DSOF ¶ 71. Mr. Aldridge returned for another appointment on May 2, 2017, and his hip condition had not changed. The surgery did not occur in September, either because UIC cancelled the appointment and rescheduled it for October 2017, as the defendants state, *id.* ¶ 72, or because Mr. Aldridge "just didn't show up."[4] Gonzalez Dep. 37:22–38:2, ECF No. 59-6. Mr. Aldridge returned to UIC on October 17, 2017 to get new x-rays of his hips and to be rescheduled for surgery. Dr. Gonzalez testified that his hip condition had again not changed, and that the outcome of the surgery would be the same regardless of when it took place. DSOF ¶ 73. Mr. Aldridge had two more appointments at UIC on February 27, 2018 and March 14, 2018, and he underwent hip replacement surgery on April 26, 2018. *Id.* ¶ 74.

## DISCUSSION

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party has the initial burden of establishing that there is no genuine dispute as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party meets this burden, "[t]he nonmoving party must point to specific facts showing that there is a genuine issue for trial." *Stephens v. Erickson*, 569 F.3d 779, 786 (7th Cir. 2009). Factual disputes do "not preclude summary judgment when the dispute does not involve a material fact." *Burton v. Downey*, 805 F.3d 776, 783 (7th Cir. 2015). When considering the summary judgment materials,

---

[4] While the parties disagree on the specifics of what transpired, deposition testimony suggests that this appointment might have been delayed due to a mistake on the part of a UIC scheduler. *See* Obaisi Dep. 174:1-9, ECF No. 59-3 (Barbara Johnson, a UIC employee and liaison for IDOC, "kind of got confused and delayed the injection. That's the reason the injection was too long ago away.").

7

the Court must "construe all facts and draw all reasonable inferences in favor of the nonmoving party." *Van den Bosch v. Raemisch*, 658 F.3d 778, 785 (7th Cir. 2011). In § 1983 cases, "the plaintiff bears the burden of proof on the constitutional deprivation that underlies the claim, and thus must come forth with sufficient evidence to create genuine issues of material fact to avoid summary judgment." *Padula v. Leimbach,* 656 F.3d 595, 600 (7th Cir. 2011).

The Eighth Amendment requires prison officials to "provide inmates with medical care that is adequate in light of the severity of the condition and professional norms." *Perez v. Fenoglio*, 792 F.3d 768, 777 (7th Cir. 2015). To state a claim under § 1983, Mr. Aldridge must show that he had an objectively serious medical condition and that P.A. Williams or Dr. Obaisi were deliberately indifferent to that condition. *Arnett v. Webster*, 658 F.3d 742, 750 (7th Cir. 2011). Deliberate indifference is distinct from medical malpractice or negligence and requires "a sufficiently culpable state of mind" such that a prison official "knows of a substantial risk of harm to an inmate and either acts or fails to act in disregard of that risk." *Id.* at 751. While a "delay in treatment may constitute deliberate indifference if the delay exacerbated the injury or unnecessarily prolonged an inmate's pain," *McGowan v. Hulick*, 612 F.3d 636, 640 (7th Cir. 2010), "[m]ere dissatisfaction or disagreement with a doctor's course of treatment is generally insufficient" to state a claim for deliberate indifference. *Johnson v. Doughty*, 433 F.3d 1001, 1013 (7th Cir. 2006).

The parties dispute whether Mr. Aldridge's osteoarthritis was a serious medical condition and the defendants' arguments on this point are not well-taken. While there may be some question as to precisely when Mr. Aldridge's osteoarthritis rose to the level of an objectively serious condition (and, to be sure, in view of his ability to play basketball in 2013, it seems unlikely to have qualified at that point in time), the record is clear that at some point Mr. Aldridge's condition

worsened to the point that medical treatment was required. It is not necessary to identify that moment, however, because even if Mr. Aldridge's condition was objectively serious throughout the period relevant to his claim, the defendants were not deliberately indifferent to that condition. To the contrary, the record reflects that both P.A. Williams and Dr. Obaisi saw Mr. Aldridge frequently and continued to address his complaints of pain and approved frequent referrals to outside specialists for consultations, examinations, and treatment—including the hip replacement surgery that Mr. Aldridge sought. In providing this care and treatment, the defendants were anything but deliberately indifferent to Mr. Aldridge's condition.

While the "receipt of *some* medical care does not automatically defeat a claim of deliberate indifference," *Edwards v. Snyder*, 478 F.3d 827, 831 (7th Cir. 2007), a detailed account of treatment received can be persuasive in rejecting such a finding, *see Lloyd v. Moats*, 721 F. App'x 490, 494 (7th Cir. 2017) (when prison officials examined the plaintiff multiple times, took x-rays, referred him to a specialist, and did not disregard his condition or make outrageous treatment or non-treatment decisions, "the record reflects a level of continuous care that is not consistent with a malicious state of mind"). Here, as detailed above, both P.A. Williams and Dr. Obaisi provided Mr. Aldridge with a course of treatment that evolved over time and included a variety of pain relief medications, physical therapy, x-rays, low bunk and double mattress permits, referrals to specialists, steroid hip injections, and ultimately surgery. Dr. Gonzalez, the UIC specialist, testified in his deposition that the "standard protocol is to start people on a course of physical therapy. If they are not better, we will attempt steroid injections into the hips and then if they are not improved we will recommend hip replacement," Gonzalez Dep. 20:15-19, ECF No. 59-6, and that it is typical to "start with the least invasive and most conservative treatment," *id.* at 21:3-4. And indeed, Mr. Aldridge admits that when the radiologist concluded that he might be a candidate for hip

replacement surgery in the summer of 2013, "there were still conservative treatment options for addressing [his] hip pain, including physical therapy, pain medications, and steroid injections." Pl.'s Resp. DSOF ¶ 26, ECF No. 68.

There is, moreover, certainly no evidence that P.A. Williams and Dr. Obaisi pursued "blatantly inappropriate" medical treatment, *Edwards*, 478 F.3d at 831, or treatment that was contrary to the recommendation of specialists, *Arnett*, 658 F.3d at 753.[5] Against this record, Mr. Aldridge has adduced no evidence that the course of treatment the defendants provided was inappropriate in any way. Nor has he explained how the defendants could have overruled the orthopedic surgeon's standard treatment protocol and required him to conduct the surgery before exhausting less invasive means of treating Mr. Aldridge's hip pain. Hip surgery is a complicated endeavor and carries many risks. DSOF ¶ 53. Before incurring such risks, in a non-emergency case like that of Mr. Aldridge, it is prudent, not reckless, to exhaust more conservative options before

---

[5] Mr. Aldridge's reliance on the notation on an X-Ray Report, "? Candidate for hip replacement" as evidence that he should have been scheduled for hip replacement surgery in 2013 is misplaced for several reasons. First, his argument ignores the fact that the notation is a question rather than a statement, at most reflecting that the physician who examined the x-rays recognized that Mr. Aldridge might be a candidate for hip replacement surgery; the notation is far from a recommendation for hip surgery as characterized by Mr. Aldridge. Second, the notation lacks the temporal urgency that Mr. Aldridge reads into it; recognizing that he might be a candidate for hip replacement surgery does not suggest in any way that such surgery is required at that time. And third, even if, as Mr. Aldridge alleges and the defendants dispute, an unnamed radiologist recommended hip surgery for Mr. Aldridge in 2013, Dr. Obaisi was entirely within his rights to make an independent medical judgment, even if it conflicted with that recommendation. "[C]hoosing one treatment recommendation over another does not amount to deliberate indifference where both recommendations are made by qualified medical professionals," *Shields v. Illinois Dep't of Corrections*, 746 F.3d 782, 797 (7th Cir. 2014); *see also Estate of Cole v. Fromm*, 94 F.3d 254, 261 (7th Cir. 1996) ("Mere differences of opinion among medical personnel regarding a patient's appropriate treatment do not give rise to deliberate indifference.") Moreover, Dr. Obaisi's judgment was consistent with the views of the UIC orthopedic surgeon, Dr. Gonzalez, who indicated that Mr. Aldridge "did not require emergent or urgent treatment, but could be treated electively," as the outcome of the surgery would be the same no matter when it occurred, and Mr. Aldridge "would not sustain any immediate or long-term harm by waiting for the surgery." DSOF ¶ 69.

turning to surgery.

And though success is not the bellwether of adequate treatment (patients sometimes have poor outcomes despite receiving stellar treatment), it is nevertheless significant to note that the treatment provided to Mr. Aldridge was effective, at least for a period of time. Mr. Aldridge reported at least some pain relief from Mobic and other pain medications the defendants prescribed, *id.* ¶¶ 27, 39, 56; from physical therapy, *id.* ¶ 49; and from the steroid injections, *id.* ¶ 66. His hip condition did not preclude him from walking unassisted, *see, e.g.*, *id.* ¶¶ 12, 37, 39, 43, 45, 51, or working six-hour shifts in the Stateville kitchen five days a week, *id.* ¶ 9. Though Mr. Aldridge might have preferred to skip ahead right to the surgery, that disagreement with the treatment plan is not sufficient to state a claim for deliberate indifference. *See Ciarpaglini v. Saini*, 352 F.3d 328, 331 (7th Cir. 2003); *Johnson*, 433 F.3d at 1013. Mr. Aldridge has not adduced evidence that would allow a reasonable jury to find that either P.A. Williams or Dr. Obaisi knew of a risk of harm to him and consciously disregarded that risk.

Dismissal of the claims against defendants Williams and Obaisi requires dismissal of the claim against Wexford as well. Mr. Aldridge cannot establish that either P.A. Williams or Dr. Obaisi violated his constitutional rights, as they did not pursue an ineffective course of treatment; it follows that Wexford's policies, practices, or customs could not have caused Mr. Aldridge to receive an ineffective course of treatment. Accordingly, Mr. Aldridge's § 1983 claim against Wexford also fails.

\* \* \* \* \*

This is not a close case. The crux of Mr. Aldridge's complaint is that he did not receive hip replacement surgery for some years after he first sought treatment for hip pain and requested hip replacement surgery in a grievance; however, Mr. Aldridge is not entitled to demand specific care,

*Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997), and the record demonstrates that the defendants provided adequate care over the entire period that defeats his claim for deliberate indifference. The defendants' motion for summary judgment is therefore granted.[6]

Date: December 3, 2019

John J. Tharp, Jr.
United States District Judge

---

[6] The Court thanks counsel for the plaintiff, Adrian Mazar and Jorge Sanchez, who have ably represented the plaintiff on a pro bono basis throughout this case.